IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRANS AMERICAN BROKERAGE, INC. | : | |
| | : | |
|     Claimant, | : | |
| | : | |
| v. | : | Case No. 02-CV-3810 |
| | : | |
| MRS. SMITH'S BAKERIES, INC., | : | |
| | : | |
|     Respondent. | : | |

**REPLY MEMORANDUM IN SUPPORT OF MRS. SMITH'S BAKERIES, INC.'S MOTION TO VACATE ARBITRATION AWARD**

Respondent, Mrs. Smith's Bakeries, Inc. ("MSB"), respectfully submits this Reply Memorandum in Support of MSB's Motion to Vacate Arbitration Award (the "Motion to Vacate").

## I. INTRODUCTION

A comparison of MSB's Memorandum in Support of the Motion to Vacate ("MSB's Memorandum") and petitioner Trans American Brokerage, Inc.'s ("TAB") Memorandum in Opposition to the Motion to Vacate ("TAB's Memorandum") establishes the following six points:

First, the Final Award at issue here does not fall within the definition of a "non-domestic" award adopted by the Second, Fifth, Ninth and Eleventh Circuit Courts of Appeal. TAB has not suggested otherwise. Moreover, even if the Final Award were a non-domestic award, which MSB denies, this Court has the authority to apply the Federal Arbitration Act's implied grounds for vacatur, since the Final Award was rendered in the United States and confirmation and enforcement are sought here.

Second, in resolving conflicts-of-law issues, Pennsylvania courts require the application of the law of the state with the most "significant relationship" to the transaction and the parties.

The record establishes, without dispute, that the arbitrator here, Christopher Lee (the "Arbitrator"), did not determine whether Georgia or Pennsylvania had the most "significant relationship."  Likewise, the Arbitrator did not specify whether Georgia or Pennsylvania law governed the parties' rights and obligations under their Distributor's Agreement (the "Agreement").

Third, in two separate legal memoranda submitted to the Arbitrator, MSB cited a 1995 Georgia Court of Appeals decision, Drug Line, Inc. v. Sero-Immuno Diagnostics, Inc., 458 S.E.2d 170, 171 (Ga. Ct. App. 1995), which was decided under virtually-identical facts and which controls the issue of liability adversely to TAB.  In the Final Award, the Arbitrator does not mention, much less attempt to distinguish, Drug Line.

Fourth, in the Final Award, the Arbitrator cites Kaczkowski v. Bolubasz, 421 A.2d 1027 (Pa. 1980), for the proposition that "the discounting of future lost profits back to present value is contrary to Pennsylvania law."  Kaczkowski does not so hold.  In fact, the Kaczkowski court specifically held that "[t]his Commonwealth now requires that a damage award be discounted to its present value by using a six percent simple interest figure."

Fifth, Georgia law does not permit the recovery of lost profits unless the plaintiff establishes a proven "track record" of profitability.  TAB's Memorandum cites no authority to the contrary.  The Final Award ignores Georgia law on this critical issue, and the Arbitrator did not seek to determine whether TAB had such a track record.

Finally, although the Arbitrator purportedly based his lost profits award upon the parties' pre-litigation sales projections, the Arbitrator applied the parties' estimates to the wrong product market.  As a result, the Final Award dwarfs anything the parties even remotely considered.  For example, as established in MSB's Memorandum and MSB's Motion for Reconsideration on the

Issue of Damages (the "Reconsideration Motion"), the lost profits awarded in the Final Award for the top five European countries listed in the Agreement, based upon estimated sales **through January 30, 2002**, are almost five times the profits the parties were estimating for those countries **by 2005**. (Reconsideration Motion at 16). As discussed in MSB's Memorandum, its Reconsideration Motion, and below, simple mathematics demand the conclusion that the Arbitrator used the wrong market. **This final point is perhaps most telling since TAB has never offered any rebuttal. TAB has never, either before the Arbitrator or before this Court, questioned MSB's calculations.**

Based upon the foregoing, MSB has made the legally-required showing that the Final Award was rendered in "manifest disregard of the law" and is "fundamentally irrational." Moreover, the Final Award is simply unjust. For these reasons, and those discussed below, the Final Award should be vacated.

##      II.    ARGUMENT AND CITATION OF AUTHORITY

### A.    The Final Award is in "manifest disregard" of applicable law

#### 1.    The Arbitrator ignored applicable choice-of-law principles.

As this Court is aware, the Agreement provides that it shall be interpreted under the laws of the "state of Georgia and/or Pennsylvania." Because the Agreement does not contain an effective choice-of-law provision, the Arbitrator had the duty to decide which law governed. As discussed at pages 13 through 15 of MSB's Memorandum, as well as at pages 30 through 32 of MSB's Post-Arbitration Memorandum, in resolving conflict-of-laws issues, Pennsylvania courts have replaced the traditional *lex loci contractus* rule with a flexible "contacts-based" approach. This approach requires the application of the law of the state with the most "significant relationship" to the transaction and the parties. Griffith v. United Air Lines, Inc., 416 Pa. 1, 203

A.2d 796 (Pa. 1964). In determining whether the Arbitrator manifestly disregarded conflicts-of-law principles, MSB asks the Court to consider three points.

First, the record establishes that the Arbitrator was aware of Pennsylvania's conflicts-of-law principles. These principles were placed squarely before the Arbitrator in MSB's Post-Arbitration Memorandum. Moreover, the Interim Award itself establishes that the Arbitrator was aware of them. He stated, in the context of whether the Agreement was enforceable, that "[b]efore the parties agreed to all essential terms, it is necessary to decide whether Georgia or Pennsylvania law is primary to resolution of this issue." (Interim Award at 5, n.3).

Second, the law of Georgia and Pennsylvania differs on at least four issues before the Arbitrator: the enforceability of the Agreement, the discounting of a lost profits award to present value,[1] the Statute of Frauds, and the recoverability of lost profits. Thus, a "true conflict" existed in the law, requiring the Arbitrator to determine which law governed.

Finally, the Arbitrator did not weigh the parties' contacts with Pennsylvania and Georgia or otherwise attempt to determine which law should govern. Instead, the Arbitrator applied Georgia law to certain issues, Pennsylvania law to others, and the law of both states to others.

In response, TAB raises three arguments. First, TAB argues that "the choice of law provision in the Distributor's Agreement permitted the Arbitrator to apply the law of *either* Pennsylvania *or* Georgia *or* the law of *both* states." (TAB's Memorandum at 6-7). MSB has been unable to find a case addressing a choice-of-law provision such as that found in the Agreement; however, MSB respectfully suggests that where, as here, a "true conflict" in state law exists, and the Agreement does not specify which state's law controls, common law principles must govern. Certainly nothing in the Agreement would permit the haphazard

---

[1] MSB contends that the laws of both states require that lost profits awards be discounted to present value, albeit at different interest rates. TAB contends that Pennsylvania law does not require discounting.

application of the laws of different states to different issues.  Finally, MSB notes that the Arbitrator apparently did not construe the Agreement as providing him unfettered discretion in choosing which law to apply.  TAB apparently concedes the point since TAB claims that the Arbitrator "dutifully attempted to apply the law of both states to the dispute." (TAB's Memorandum at 7).

Second, TAB argues that "it is clear … that the Arbitrator concluded that there were no material differences between Pennsylvania and Georgia law." (TAB's Memorandum at 9).  This argument does not withstand scrutiny.  The Final Award demonstrates that the Arbitrator believed that Georgia and Pennsylvania law differed on the enforceability of the Agreement. (See Interim Award at 5, n.3).   He also believed that Pennsylvania and Georgia law differed on the discounting of lost profits to present value, since he erroneously refused to discount his award, and on the Statute of Frauds.  (See Interim Award at 10, n.7).

The Arbitrator did attempt to harmonize Georgia and Pennsylvania law on the issue of lost profits (See Interim Award at 21), but, in doing so, disregarded controlling Georgia precedent of which he was **repeatedly** made aware.

Finally, TAB contends that MSB is simply arguing "that the Arbitrator was 'wrong' in connection with the Arbitrator's choice of law analysis." (TAB's Memorandum at 1).  TAB misconstrues MSB's argument.  MSB does not contend that the Arbitrator did, in fact, seek to determine which law governed and chose the wrong law.  **Here, the Arbitrator made no determination at all.**  The Final Award will permit no other conclusion.[2]

---

[2] Citing the dissenting opinion in Griffith, TAB also argues that Pennsylvania's "contacts-based" approach leads to uncertainty and is highly subjective. (TAB's Memorandum at 8).  As MSB has demonstrated, Pennsylvania courts have extended and consistently applied Griffith's methodology to contract actions. (MSB's Memorandum at 13, n.7).

> **2.    Had the Arbitrator undertaken the required choice of law analysis, he would have necessarily concluded that Georgia had more significant contacts with the parties and the transaction.**

As set forth in MSB's Memorandum, Pennsylvania's conflicts-of-law approach requires the application of the law of the state with the most significant relationship to the transaction and the parties. (MSB's Memorandum at 13). Had the Arbitrator conducted the required analysis, he would have necessarily concluded that Georgia had far more significant contacts with the parties and the transaction here. Before addressing these contacts, MSB emphasizes again that the issue before the Court is not whether the Arbitrator improperly weighed the respective contacts between Pennsylvania and Georgia. **The Arbitrator did not conduct the analysis at all.**

TAB contends that the only connection with Georgia is MSB's headquarters and "some initial discussions" that occurred there. (TAB's Memorandum at 9). To the contrary, not only did TAB's initial presentation to MSB in December 1998 occur in Georgia, which lead to the execution of the Agreement, additional in-person meetings occurred in Georgia in May, 1999 (11/15 Transcript at 35-36, 201-202); July, 1999 (9/26/99 Transcript at 112; MSB Exh. 31); September, 1999 (11/15/01 Transcript at 148; 11/16/01 Transcript at 131); and February, 2000 (9/28/99 Transcript at 53-54).

Although the formation of the contract did not take place in Georgia (or in Pennsylvania), substantial in-person negotiations regarding the terms of the contract and the performance of the parties occurred in Georgia. No such negotiations occurred in Pennsylvania. In fact, no evidence in the record indicates that an employee of MSB ever went to Pennsylvania in connection with this transaction.

In the face of these substantial contacts, TAB alleges that MSB's pies would have been shipped to Philadelphia and TAB would have taken control of them there. (TAB's Memorandum

at 8). TAB offers no evidentiary support for this assertion. Other than this unsupported contact, the only contact with Pennsylvania is TAB's headquarters is located there. Accordingly, had the Arbitrator not ignored the determination of which law applied, the required choice-of-law analysis would have established that Georgia law had more significant contacts with the parties and the transaction, and Georgia law should control.

### 3. The Arbitrator ignored controlling Georgia authority on the enforceability of the Agreement.

Georgia authority on the unenforceability of an "agreement to agree" was placed squarely before the Arbitrator, both in MSB's Motion for Summary Adjudication and its Post-Arbitration Memorandum. (See Motion for Summary Adjudication at 4-8; Post-Arbitration Memorandum at 32). Copies of MSB's Motion for Summary Adjudication and MSB's Post-Arbitration Memorandum are attached hereto as Exhibits A and B, respectively. Georgia law on this issue is neither vague nor difficult to understand. To the contrary, a 1995 opinion of the Georgia Court of Appeals, Drug Line, Inc. v. Sero-Immuno Diagnostics, Inc., 458 S.E.2d 170, 171 (Ga. Ct. App. 1995), sets forth the applicable Georgia law in the context of a virtually-identical distributor's agreement. Thus, the Arbitrator recognized and understood that, under Georgia law, a contract will not be enforced unless all the material terms are agreed upon and nothing is left to further negotiations. Accordingly, the Arbitrator was well aware that, under Georgia law, the Agreement was not binding at the time it was signed because almost all of the material terms to a distributorship relationship (such as price, credit terms, product description and quantity) were left to future negotiations and **written** agreement. By holding that the parties **orally** agreed to the open terms at a subsequent date (See Interim Award at 5) and that the Agreement then

became enforceable, the Arbitrator expressly disregarded the holdings of Drug-Line and Wells. (See MSB's Memorandum at 15-17).[3]

TAB contends that Wells does not apply because that case was not decided under the Uniform Commercial Code ("UCC"). (TAB's Memorandum at 10). TAB is wrong. Wells is based on the fundamental premise of contract law that any valid contract requires a meeting of the minds and mutuality. See Drug Line, Inc., 458 S.E.2d at 171. This threshold requirement exists whether the contract is construed under the UCC or common law, or whether it be a sales or distribution agreement, or a requirements or output contract. Id. These points were discussed, in detail, in MSB's Motion for Summary Adjudication and Post-Arbitration Memorandum, and the Arbitrator was therefore aware of them.

TAB also contends that Drug Line is distinguishable because, after the Agreement was signed, the parties orally agreed to the missing terms. (TAB's Memorandum at 10). At the outset, MSB notes that **the Agreement contemplated that any such agreements would be in writing, and no writing exists.** This point was made repeatedly in pleadings filed with the Arbitrator, and he ignored it. He did so even though he expressly recognized, in rejecting an alleged oral extension of the Agreement, that the Statute of Frauds required any modification to the Agreement to be in writing.

Regardless, TAB's contention here misses the point. As noted above, under Wells and Drug Line, an agreement to execute another agreement, in the future, imposes no obligation on the parties. Thus, the Agreement, because it contemplated the execution of a subsequent **written** agreement regarding material terms, was not binding at the time it was executed. By relying

---

[3]     TAB claims that MSB concedes that the Agreement is enforceable under Pennsylvania law. To the contrary, the alleged oral modifications to the Agreement which the Arbitrator enforced are barred by Pennsylvania's Statute of Frauds. (See MSB's Memorandum at 18). As noted in MSB's Memorandum, the Arbitrator expressly

upon alleged oral understandings in enforcing the Agreement, the Arbitrator ignored controlling Georgia authority.

### 4. The Arbitrator ignored controlling Georgia authority on the recoverability of lost profits.

Regarding the above-framed issue, TAB suggests that MSB is merely arguing that the Arbitrator misinterpreted Georgia law on the recoverabilty of lost profits. (TAB's Memorandum at 1-2). To the contrary, the Arbitrator flatly disregarded controlling Georgia authority and reached a result which is contrary to Georgia law.

Georgia law is absolutely clear that the owner of a business may recover lost profits <u>only</u> if the business has a proven "track record" of profitability. (MSB's Memorandum at 18). This clearly-applicable principle of Georgia law was placed squarely before the Arbitrator in MSB's Motion for Summary Adjudication, Post-Arbitration Memorandum and Reconsideration Motion. (<u>See</u> Motion for Summary Adjudication at 14; Post-Arbitration Memorandum at 55; Reconsideration Motion at 22). **TAB has never cited any authority to the contrary, nor could it.** Accordingly, the record before the Court establishes that Georgia law on the issue of lost profits was absolutely clear, and the Arbitrator was well aware it.

By holding that "[b]oth Pennsylvania and Georgia follow the rule which provides that expected lost profits damages may be awarded, and that the <u>only</u> limitation is that such damages must be established with reasonable certainty" (Interim Award at 21), the Arbitrator expressly disregarded controlling Georgia precedent to which he had been cited repeatedly. To make matters worse, the Arbitrator awarded TAB lost profits without even addressing whether TAB had a track record of profitability.

---

found that section 2209(c) of Pennsylvania's Uniform Commercial Code required that any modifications to the Agreement be in writing (<u>See</u> Interim Award at 11), yet he inexplicably permitted oral modifications.

TAB argues that its tax returns and financial statements established that TAB had been a profitable business for a number of years prior to its transaction with MSB. (TAB's Memorandum at 13). At the outset, MSB notes that it is not contending that the Arbitrator incorrectly found that TAB had a proven track record of profitability. **The Arbitrator did not address this issue at all.**

TAB admittedly presented anecdotal claims of launching new products in Europe; however, **TAB has never attempted to support its lost profits claim by a proven track record of profitability as required by Georgia law.** To suggest that its tax returns support the damage award is frankly a joke. A comparison of TAB's "track record" demonstrates the outrageousness of TAB's lost profits award.

The exhibits to Robert Cantor's report include TAB's tax returns. The tax returns reveal that the company's net income for 1997, 1998 and 1999 was $15,840, ($-44,048) and $51,888, respectively. The average income for those three years is $7,893. The profits the Arbitrator awarded for 2000, $3,497,195,[4] are 443 times TAB's average income for the prior three years. Removing the 1998 loss and averaging only the 1997 to 1999 profits yields $33,864. The lost profits award for 2000 is 103 times that figure. To suggest that TAB's "track record" supports its damage claim is ludicrous.

Finally, even if TAB were a profitable enterprise prior to the year 2000, TAB ignores the fact that the introduction of frozen pies into the European market was a new business venture for TAB and MSB, and there is absolutely no evidence that TAB has a track record of profitability, *or a pattern of diminishing losses,* in introducing frozen desserts in Europe. Georgia law recognizes a distinction between a profitable business, such as MSB, and a profitable business

---

[4]   See Exhibit 7 of Cantor's Report.

venture, such as the distribution of frozen pies in the European market.  Accordingly, MSB has met its burden of establishing that the Arbitrator recognized and ignored controlling Georgia law and reached a contrary conclusion in spite of this law.

### 5.    The Arbitrator ignored controlling law on the discounting of lost profits awards to present value.

The Interim Award cites <u>Kaczkowski v. Bolubasz</u>, 491 Pa. 561, 583, 421 A.2d 1027, 1038-39 (Pa. 1980), for the proposition that "the discounting of future lost profits back to present value is contrary to Pennsylvania law."  (Interim Award at 18).  A cursory reading of the opinion demonstrates that <u>Kaczkowski</u> was miscited and that the case does not hold that discounting future lost profits is contrary to Pennsylvania law.  In fact, the <u>Kaczkowski</u> court specifically held that:

> This Commonwealth now requires that a damage award be discounted to its present value by using a six percent simple interest figure.  **We do not wish to disturb this requirement in calculating future damages in other contexts.**

<u>Kaczkowski</u>, 421 A.2d at 1037 n.21 (emphasis added).

Apparently recognizing that <u>Kaczkowski</u> does not support the proposition cited in the Interim Award, TAB's Memorandum tries a different approach.  TAB argues that "MSB has cited no cases to this Court, and it cited none to the Arbitrator below, to support its argument that the 'total offset rule' adopted by the Pennsylvania Supreme Court in <u>Kaczkowski</u> does *not* apply in cases involving lost profits by a business."  (TAB's Memorandum at 14).  In response, MSB asks the Court to consider two points.

First, the Final Award does not specify why Pennsylvania law should even govern this issue.  As noted above, the Arbitrator made no inquiry into the parties' contacts with Pennsylvania and Georgia and, if the Arbitrator were correct that the discounting of lost profits to present value is contrary to Pennsylvania law, then a "true conflict" would exist between the

laws of Georgia and Pennsylvania.  Georgia law undeniably requires discounting to present value.

Second, as to TAB's request for authority that "Kaczkowski does *not* apply in cases involving lost profits by a business," MSB has cited the limiting language of the opinion itself. The Kaczkowski court expressly held that Pennsylvania law "now requires that a damage award be discounted to its present value by using a six percent simple interest figure."  Kaczkowski, 421 A.2d at 1037 n.21.  No other case citation is necessary.  Moreover, numerous Pennsylvania courts have concluded that the exception created by the court in Kaczkowski does not apply in various other contexts.  See, e.g., Viener v. Jacobs, 52 Pa. D. & C.4th 353, 382 (2001); Standard Pipeline Coating Co., Inc. v. Solomon & Teslovich, Inc., 496 A.2d 840, 845 (Pa. Super. Ct. 1985); Carpenter Tech. Corp. v. Armco, Inc., 800 F. Supp. 215, 226 (E.D. Pa. 1992).

TAB's Memorandum argues that "MSB offers no evidence to show that the Arbitrator understood that it would be inappropriate not to discount TAB's damages, but nonetheless proceeded not to discount TAB's damages."  (TAB's Memorandum at 14).  This is exactly what the Arbitrator did, and, by doing so, he reached a conclusion contrary to well-defined law.

Discounting lost profits damages to present value is clearly required under both Pennsylvania and Georgia law.  (See MSB's Memorandum at 20-22).  The limiting language in Kaczkowski was placed squarely before the Arbitrator in MSB's Reconsideration Motion. (Reconsideration Motion at 16-18).  Moreover, Georgia's requirement that lost profits awards be discounted to present value was also placed directly before the Arbitrator.  (Id.).  Thus, the law of both states was absolutely clear, was undeniably applicable, and was recognized by the Arbitrator.  By failing to discount the damages, the Arbitrator disregarded the law and reached a legal conclusion that is contrary to the law and manifestly incorrect.

### B.     The Final Award Is "Fundamentally Irrational"

As noted in MSB's Memorandum, and as TAB's Memorandum acknowledges, the Arbitrator supported his finding of damages by focusing on the parties' pre-litigation estimate that they could achieve "a 2% overall market share of the frozen dessert category within the top 5 targeted European markets" by 2005.  (TAB Exh. 38 at T01171).  This estimate was central to both the Final Award and to the opinions of TAB's damages expert, Robert Cantor.  The parties did not define the "frozen dessert category."  Nevertheless, both Mr. Cantor and the Arbitrator assumed, **without any support in the record**, that the relevant market for purposes of the two percent estimate included ice cream.  They made this assumption even though MSB does not sell ice cream and ice cream is a distinct product market in Europe.  This is evidenced by, inter alia, the fact that the Leatherhead Report ("Leatherhead") separates ice cream as a distinct market.  Moreover, even TAB's own expert Richard Onion excluded ice cream in his calculations of the market in the United Kingdom.  (See Reconsideration Motion at 8; TAB Exh. 163).

Faced with this multi-million dollar error, TAB asks the Court to ignore it.  TAB argues that the Final Award has a "colorable justification":

> [T]the Arbitrator clearly indicated that the basis of TAB's lost profits damages award was the parties' joint pre-litigation projection that they would achieve a 2% share of the frozen dessert market with the top 5 European markets … Accordingly, the Court need go no further in order to reach the conclusion that the Award is not "fundamentally irrational."

(TAB's Memorandum at 15).

TAB, intentionally or unintentionally, misses the point.  TAB had the burden of proving that, in using the phrase "frozen dessert category," the parties intended to include ice cream.  In MSB's Memorandum, MSB invited the Court "to examine every instance in which the word 'ice cream' appears in the arbitration transcript."  (MSB's Memorandum at 24).  MSB suggested that

the Court would "find no testimony supporting the conclusion that the parties intended to include ice cream in the market for purposes of the two percent estimate." (Id.). TAB's Memorandum proves MSB's point. **TAB has not cited any testimony that even remotely suggests that, in discussing the two percent estimate, the parties intended to include ice cream in the potential market.**

Instead, TAB has cited to various documents which use the phrase "frozen dessert category" and to a picture of an ice cream cone. What is conspicuously missing from TAB's Memorandum, however, is any challenge to the inescapable conclusions that must be drawn from any fair analysis of the parties' quantification of the "frozen dessert category." As noted in MSB's Memorandum, in TAB's "European Sales and Marketing Plan Outline," dated June 18, 1999, which is the very document that evidences the parties' two percent estimate, TAB quantified the "total potential of the frozen dessert category **in 2005**" as follows:

| Country | Total Potential Of The Frozen Dessert Category in 2005 |
|---|---|
| Germany | $ 783,571,306 |
| France | 538,996,499 |
| Italy | 145,264,786 |
| United Kingdom | 412,428,350 |
| Spain | 143,609,244 |
| Total | $2,023,870,185 |

(TAB Exh. 38 at T01172).

Based upon the Leatherhead Report and including ice cream, TAB's expert Robert Cantor quantified the "frozen dessert market" **in 1998** as follows:

| Country | Retail Sales (in billions) |
|---|---|
| Germany | $1.601 |
| France | $ .979 |
| Italy | $ .578 |

|  |  |
|---|---|
| United Kingdom | $1.738 |
| Spain | $  .225 |
| Total | $4.946 |

(Cantor Report, TAB Exh. 161, at 7).

Comparing TAB's June, 1999 estimates with Cantor's projections establishes that the Leatherhead "frozen dessert market" is not the same as the "frozen dessert category" upon which the parties based their two percent estimate. The market, as quantified by Cantor, is 2.44 times bigger in 1998 than the "frozen dessert" market TAB and MSB were projecting for 2005. TAB's Memorandum did not challenge these facts, and apparently TAB hopes that the Court will ignore them as well. Indeed, TAB has never challenged the calculations set forth in the Reconsideration Motion which establish, beyond dispute, that the Final Award cannot be supported based upon the parties' pre-litigation projections.

TAB's Memorandum likewise offers no explanation why TAB, in June 1999, estimated that the "total potential of the frozen dessert category in 2005" for the United Kingdom would be $412,428,350, when, according to Leatherhead, if ice cream is included, the value of the market in 1998 was $1.738 billion. TAB's Memorandum offers no explanation why, according to TAB's "European Sales and Marketing Plan Outline," the total potential of the frozen dessert category in Germany in 2005 would be $783,571,306, when, according to Leatherhead, the market in 1998 (including ice cream) was $1.601 billion.

Not only does TAB ignore the foregoing facts regarding the relevant market, TAB ignores the impact that the Arbitrator's use of an artificially-inflated market had on the lost profits award. For example, as noted above, the lost profits awarded in the Final Award for the top five European countries, based upon sales **only through January 30, 2002**, are almost five times the profits the parties were estimating for those countries **by 2005.** (Reconsideration

Motion at 16). Equally telling, because the Arbitrator and Cantor used the wrong market, the Final Award awards lost profits for 2000 and 2001 of $3,497,195 and $5,717,568, respectively, even though in 1999, TAB was projecting profits **by the year 2005**, of only $2,023,869. (Reconsideration Motion at 16).

In addition, TAB's Memorandum ignores the fact that in its "European Sales and Marketing Plan Outline," TAB projected case sales by the end of 2005 of 1,037,882 cases; yet, Cantor's report projects case sales for the same period and the same five countries of 4,229,234. (Reconsideration Motion at 16; MSB's Post-Arbitration Memorandum at 65-66).

Contrary to TAB's arguments, the foregoing are not mere "factual errors." The Arbitrator's use of the wrong market represents a fundamental flaw in the Final Award and renders the award without any support in the record and "fundamentally irrational." Moreover, the Final Award is patently unjust and unfair.

### C. The New York Convention Does Not Govern The Confirmation And Enforcement of The Final Award

#### 1. The Final Award is not a non-domestic award within the meaning of the New York Convention.

As noted in MSB's Memorandum in Support of its Response to TAB's Petition to Confirm Arbitration Award and Enter Judgment ("MSB's Response to Petition"), the New York Convention (the "Convention") does not define "non-domestic" awards. However, the Second, Fifth, Ninth and Eleventh Circuit Courts of Appeal have adopted a definition and the Final Award clearly does not fall within it. (See MSB's Response to Petition at 5-6). TAB apparently concedes this point since TAB's Memorandum is silent on the issue. Accordingly, if this Court adopts the same definition of "non-domestic" as these Circuit Courts, then the Court should

conclude that the Final Award is not a non-domestic award within the meaning of the Convention.  (See MSB's Response to Petition at 4-6).

If the Court agrees that the Final Award is not a non-domestic award within the purview of the Convention, the Court need not address the application of 9 U.S.C. § 202.  As discussed in MSB's Response to Petition, this section creates an exception for non-domestic awards where the commercial relationship is entirely between United States citizens, provided that the "relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states."  9 U.S.C. § 202.

Even if the Final Award were a non-domestic award, for the reasons discussed in MSB's Response to Petition, none of the factors set forth in the statutory exception exist here.  (See MSB's Response to Petition at 6-8).  In footnote 9 of TAB's Memorandum, TAB claims that the Agreement envisaged performance abroad.  TAB's own allegations, however, support the fact that the Agreement contemplated performance by the parties here in the United States.  In TAB's Memorandum, TAB states that "the contract was *not* to be performed in Georgia (MSB would have manufactured the pies in Oklahoma and shipped them to Philadelphia, where TAB was to take control of them and ship them to Europe)."  (TAB's Memorandum at 8).  Thus, any products that TAB purchased under the Agreement were to be manufactured, sold and delivered by MSB in the United States, and TAB was to take possession and title here.  Once TAB took delivery and title, MSB's performance was completed; the pies were no longer MSB's property; and TAB bore the responsibility to ship the products to Europe.  At that point, an affiliated entity, TAB Trading GmbH, would distribute them.  For reasons discussed in MSB's Response to Petition, this is not the type of performance contemplated by section 202.

> **2.   Even if the Final Award is a non-domestic award, this Court has the authority to apply the Federal Arbitration Act's implied grounds for vacatur to non-domestic awards *rendered in the United States*.**

Regardless of whether the Final Award is a non-domestic award, this Court has the authority to vacate the Final Award as being in "manifest disregard of the law" and "fundamentally irrational."  TAB's Memorandum erroneously argues that non-domestic awards must be confirmed, except in the limited circumstances set forth in the Convention. (TAB's Memorandum at 19).  TAB's Memorandum, however, ignores the authorities cited in MSB's Response to Petition which recognize a District Court's authority to vacate non-domestic awards **rendered in the United States**.  As demonstrated in MSB's Response to Petition, even if the Court determined that the Final Award is "non-domestic" or that the Convention otherwise applies, the Court still is authorized to apply United States procedural arbitral law, i.e., the Federal Arbitration Act, to the Final Award since it was rendered in the United States and confirmation is sought here.  See Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 19-20 (2d Cir. 1997); see also MSB's Response to Petition at 8-10.  TAB has not cited any authority to the contrary, and, in fact, has completely ignored MSB's argument. [5]

Because the Final Award was rendered in the United States under the procedural and substantive laws of this country, and both confirmation and vacatur are now sought here, this Court has the authority to vacate the Final Award as being in "manifest disregard of the law" and "fundamentally irrational."

---

[5]   As discussed in MSB's Response to Petition, this conclusion is consistent with the reasoning of those courts that have refused to apply non-Convention bases for relief.  Those courts that have refused to apply the implied grounds for vacatur to non-domestic awards did so only in the context of awards rendered abroad and sought to be enforced in the United States.  (See MSB's Response to Petition at 10).

ATI-2001589v1                                          18

### III.    CONCLUSION

For the foregoing reasons, MSB respectfully requests that this Court grant MSB's Motion to Vacate and vacate the Final Award in its entirety.

Dated:  July 26, 2002

                                          Respectfully submitted,

                                          _____
                                          R. Matthew Martin
                                          (Admitted pro hac vice on July 2, 2002)
                                          JONES, DAY, REAVIS & POGUE
                                          3500 SunTrust Plaza
                                          303 Peachtree Street, N.E.
                                          Atlanta, Georgia 30308-3242
                                          (404) 521-3939

                                          John E. Iole
                                          Pa. I.D. # 47768
                                          JONES, DAY, REAVIS & POGUE
                                          500 Grant Street, 31st Floor
                                          Pittsburgh, PA  15219
                                          (412) 391-3939

                                          Attorneys for Respondent
                                          Mrs. Smith's Bakeries, Inc.

## CERTIFICATE OF SERVICE

This is to certify that I have this day caused to be served a copy of the attached REPLY MEMORANDUM IN SUPPORT OF MRS. SMITH'S BAKERIES, INC.'S MOTION TO VACATE ARBITRATION AWARD by United States Mail:

>   Wayne A. Mack, Esq.
>   Duane Morris LLP
>   One Liberty Place
>   Philadelphia, Pennsylvania   19103-7396

This 26th day of July, 2002.

_____
Michael Wolak, III

Attorney for Respondent
Mrs. Smith's Bakeries, Inc.

JONES, DAY, REAVIS & POGUE
3500 SunTrust Plaza
303 Peachtree Street, N.E.
Atlanta, Georgia 30308-3242
(404) 521-3939

ATI-2001589v1